1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

RONALD SCOTT BEATTY,                      )
                                          )
                Plaintiff,                )        Case No.  2:13-cv-1092-APG-GWF
                                          )
vs.                                       )        **FINDINGS AND**
                                          )        **RECOMMENDATION**
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social Security,   )        Motion to Remand (#21)
                                          )        Cross Motion to Affirm (#25)
                Defendant.                )
_____ )

        This matter is before the Court on Plaintiff Ronald Scott Beatty's Complaint for Review of

Final Decision of the Commissioner of Social Security (#3), filed on June 27, 2013.  Defendant's

Answer (#11) was filed on August 30, 2013, as was a certified copy of the Administrative Record

(the "AR").  *See Notice* (#12).  This matter has been submitted to the undersigned United States

Magistrate Judge for Findings and Recommendations on Plaintiff's Motion for Remand (#21), filed

on February 5, 2014.  The Acting Commissioner filed her Cross Motion to Affirm (#25) and

Opposition to Plaintiff's Motion for Remand (#26) on May 6, 2014.  Plaintiff filed his Reply (#29)

on June 21, 2014.

## BACKGROUND

        Plaintiff seeks judicial review of Administrative Law Judge ("ALJ") G. Alejandro

Martinez's decision dated July 28, 2011.  *See* Administrative Record ("AR") 22-35.  The issues

before the Court are: (1) whether the ALJ erred by failing to articulate convincing reasons for

rejecting the credibility of Plaintiff's testimony and statements regarding the severity of his

symptoms, (2) whether the ALJ failed to provide legitimate reasons for rejecting or giving only

slight weight to the opinions of Plaintiff's treating or examining psychologist and an advanced

practice registered nurse in determining Plaintiff's residual mental functional capacity ("RFC"); and (3) whether, as a result of such alleged errors the ALJ should have found that Plaintiff's severe mental impairments met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, or that Plaintiff was unable to perform his past work or other light or sedentary work available in the national economy.

## A.   Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits and also protectively filed a Title XVI application for supplemental security income on March 4, 2009. AR 22. In both applications, Plaintiff alleged that he became disabled on January 7, 2008. *Id*. The claims were denied initially and upon administrative reconsideration. *Id*. Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. At an initial hearing in Salt Lake City, Utah, on January 12, 2011, Plaintiff appeared with his attorney and testified in support of his claim. *Id*. Dr. Ross Lipton, a medical expert, also testified at the hearing in regard to Plaintiff's physical impairments. *Id*. At the conclusion of the hearing, the ALJ decided that a supplemental hearing with a psychologist was required to assess Plaintiff's alleged mental impairments. *Id*. On July 19, 2011, the ALJ conducted a supplemental hearing. AR 22. James Roman Cowart, a vocational expert, was present and testified. AR 45, 47. Dr. Ronald Houston, the medical expert for mental impairments was not present. In lieu of his presence, the ALJ admitted Dr. Houston's written Psychiatric Review Technique. *Id*. Plaintiff elected to proceed without the opportunity to question Dr. Houston. *Id*.

In a decision dated July 28, 2011, ALJ Martinez found that Plaintiff was not disabled within the meaning of the SSA. *Id*. Plaintiff timely filed a Request for Review, which was denied by the Appeals Council on April 16, 2013. AR 1. Plaintiff then filed this action for judicial review pursuant to 42 U.S.C. 405(g). This matter has been referred to the undersigned for a report of findings and recommendations under 28 U.S.C. §§ 636(b)(1)(B) and (C).

## B.   Factual History

Plaintiff Ronald Scott Beatty was born on July 5, 1958. AR 50-51, 230. He was 49 years old at his alleged disability onset date. AR 34. He is 5'10" and weighed 215 pounds. AR 271.

2

Plaintiff completed the tenth grade and has had no other formal education. AR 107. He has never

been married and may have two children who he has never met. AR 54, 107. During the first

hearing before the ALJ, Plaintiff was residing with his mother in her one bedroom apartment,

which he had done since 2008. AR 116. Prior to that he resided in numerous shelters including the

residential program for Salvation Army and the Road Home Shelter, and he resided in his car for

seven weeks. AR. 117. At the second hearing on July 19, 2011, Plaintiff stated that his mother

passed away in May and that he was now living in a tent and out of his car. AR 51.

Plaintiff testified that he last worked, for approximately a year and a half, at the Salvation

Army dormitory as a dorm attendant. That employment ended in December 2006. *Id*. He

indicated that he "couldn't do it any more" and they let him go when he stopped going to work.

AR 108. He testified that similar instances have happened approximately ten times in the past

where he left good jobs because he had "episodes where [he] just can't do -- [he] just stop[s] doing

everything." AR 108. His past employment included construction work, customer service, sales

clerk, and ticket writer at a casino. AR 109. He testified that he previously had been able to work

because he "had to," but stated that he was now no longer able to because:

> ... it's been too long for me to -- things are just about over for
> me...I'm suicidal at times. Sometimes really suicidal. For the last
> few months, it's been really tough on me. I changed medications a
> few month[s] ago, and I had a bad reaction to it, and it really put me
> at my lowest. And so, I'm convinced right now, I can't deal with
> what I've done for the last 40 years... [d]ealing with my problems and
> my -- what I always thought was depression and sickness.

AR 110-11.

During the first hearing before the ALJ, Plaintiff testified that he has consumed alcohol

since he was 12 years old. AR 111. He stated that the last time he drank was probably November

(2010) and that he consumed less than a twelve pack. *Id*. He testified that prior to that he probably

only consumed alcohol 10 times in two years when he was between medications or when he missed

alcohol and thought it would help him through things. *Id*. During the second hearing, he testified

that he had consumed alcohol since he was 17 or 18. AR 72. He stated that "in a way" his sobriety

date is July 2007 when he started working for the Salvation Army. AR 55. He stated that he "can

basically remember every time I drank beer since 2007," noting that he "probably had a beer maybe

20 times" since 2007, with five of those occasions occurring in 2011.  AR 56.

Plaintiff testified that he thinks about suicide all of the time.  AR 118.  He stated that he will not drive on the freeway because:

> [i]f I'm going 75 and I've just decided to crank the wheel, then that's what I'm going to do.  And it's so real, and it's so dark, and it's what I think about that I've many times pull[ed] off the freeway.  Just frickin' nuts, you know?  My life is in danger, and I feel it all the time.  My best place to be is just somewhere with nothing to think about.  I just watch TV.

AR 118-19.

Plaintiff alleged that his physical disability began on January 7, 2008, when he slipped on ice and dislocated his right knee.  AR 94.  He alleged disability primarily because of his right knee injury, depression, and PTSD.  AR 50.  Plaintiff's attorney stated at the first hearing, however, that "his biggest problems are mental -- his anxiety disorder, PTSD, and his depression," and that but for his mental impairments, he would be able to work.  AR 52, 96, 121.  When asked whether he could perform a sitting job, Plaintiff testified at the second hearing:

> It depends.  You know, and I think I said this at the last hearing, that my knee and my wrists aren't the main problem, it's my anxiety and my depression.  And I'm not saying even right now I feel like killing myself today, but it comes up all the time every day that I think about it.  And with that, that's, you know, that's my main problem.  And when I'm on my medication, I feel a big difference.  I started taking medication when I got into the Salvation Army and seeing a therapist back in 2007.  And it seemed to help, although it slowed me down and I couldn't -- my memory was bad.  And then it -- then after a while the Prozac wore off to where it wasn't affecting me very much, so we tried other drugs, and since my suicide attempt this February, I'm almost afraid to have any drugs around.

AR 61.

When asked to describe his panic attacks and how they affect him, Plaintiff stated:

> Well, it affects me, my breathing changes, I get really nervous, even my eyesight gets fuzzy sometimes, and I just -- it gets to where I start to panic.  And it doesn't matter where I'm at.  If it's in a grocery store or if it's in a courtroom.  Like at our last hearing, I was dead in the middle of a panic attack that whole hearing.  And I can get it while I'm driving, and I have to take an off-ramp, and I just have to just get out of the situation.

AR 63.

. . .

4

Plaintiff testified that the number of panic attacks he experiences has increased over the years and that he suffered about twenty panic attacks over the last two years. When asked by his attorney if he had attacks about once a month, Plaintiff responded: "It's more than once a month now." AR 63. He stated that the attacks last "easily two hours" and sometimes longer. AR 63-64. He reported having panic attacks in the grocery store and Walmart. AR 67. He also reported having difficulty taking the garbage outside, stating that he would let three or four garbage bags fill up. AR 67.

In a function report dated April 20, 2009, Plaintiff described his daily activities as:

> Take a shower if I can. Get something to eat. Go to appointments, clinic, general asst. therapist. Take medicine (8 pills). Walk as little as possible.
>
> Try to arrange a place to stay - listen to radio, read books. Eat dinner. Go to where I'm staying. Rest my leg. Go to sleep.

AR 291.

Plaintiff reported that prior to his illness, injury or condition, he was able to "[w]alk for more than 10 minutes, have sex, have a clear mind, had more energy." AR 292. With regard to house work, he reported being able to clean, dust, wash dishes, and do laundry. AR 293. He stated "wherever I am staying I try to help out" noting that he needed many rest periods to perform the tasks. *Id*. With regard to social activities he reported that "wherever I sta[y] I talk to people," but noted that it was not too often. AR 295. He stated that his social activities included riding the bus because he cannot walk without extreme pain. AR 296. He reported that he can walk two blocks before needing to stop for a one minute rest. *Id*. He reported getting along "very well" with authority figures, but has been fired or laid off from jobs because he sometimes "go[es] overboard when it comes [to] disliking co-workers." AR 297.

## C.  Medical History (Physical)

On January 7, 2008, Plaintiff presented to the Emergency Department of LDS Hospital with complaints of knee pain and deformity. AR 342. He reported slipping near the Salvation Army facility. *Id*. Physical examination of Plaintiff revealed "a burly, vigorous, plethoric appearing man." *Id*. Neurologically, Plaintiff's strength and movement were normal and symmetrical

5

without evidence of impairment. *Id*. He showed no depressed affect, agitation, or inappropriate

behaviors. *Id*. Plaintiff was diagnosed with a laterally dislocated patella. *Id*. The examining

physician, Dr Welch, stated:

> We got off to a rocky start because I tried to quickly reduce the
> patella, and the patient fought me and grabbed my arms, and became
> extremely angry and aggressive. I showed him that we could reduce
> the fascia and that we could get pain medicine, but he refused to let
> me try. In fact, he initially wanted another physician. Eventually, we
> titrated fentanyl to his comfort and reduced the patella in less than 10
> seconds with great anatomic realignment and no neurovascular
> deficits. There is no a [*sic*] mass effusion. He has a good range of
> motion. There is always the possibility of an occult secondary injury,
> and so the patient is going to have films to make sure that it is
> normal.

AR 342-43.

Plaintiff was placed in a knee immobilizer for at least 2 weeks and referred to the 4th Street

Clinic for a check up.

On January 11, 2008, Plaintiff returned to the LDS Hospital with complaints of increasing

pain and a swollen knee. AR 340. Physical examination revealed a "pleasant, well-kempt-

appearing man." *Id*. An x-ray of Plaintiff's knee suggested there might be a small fracture, and a

CT scan revealed a tiny avulsion fracture of the patella and of the femoral condyle. *Id*. Dr. Welch

refilled his Lortab prescription and referred him to an orthopedist at the 4th Street Clinic. *Id*. Dr.

Welch offered to do an arthrocentesis, but Plaintiff refused the procedure. *Id*. He was assessed

with probable hemarthrosis and effusion and instructed to stay off of his leg and elevate it as much

as possible. AR 341.

On April 8, 2009, Plaintiff reported to Amy Whipple at the 4th Street Clinic for

prescriptions. AR 349. She noted that he was now using a cane to help him get around because the

pain in his knee was causing pain in his right hip and lower back. *Id*. She noted that Plaintiff was

waiting to undergo knee surgery. *Id*. Plaintiff would not permit Ms. Whipple to draw his blood

reporting that he was "fearful of needles." AR 350.

On June 9, 2009, Plaintiff presented to Richard Ingebretsen, M.D., PhD for a physical

examination to determine Plaintiff's functional level. AR 374. The doctor noted that Plaintiff

"walked easily and normally into the examination room and without the use of a cane." *Id*.

Plaintiff reported being able to walk for up to 2-3 blocks before needing to rest. *Id*. He reported

pain in his right wrist that he believed was carpal tunnel syndrome. *Id*. He reported smoking about

one pack of cigarettes per day and using alcohol. *Id*. Dr. Ingebretsen opined that Plaintiff was:

> ... independent in all activities of daily living and self care. He is
> able to dress and feed himself and clean and shower himself. He can
> drive a car. He is able to make a bed and he is able to make dinner
> and cook other meals... He can manage his own finances. He spends
> his days watching TV and reading. He tries to go outside as he can.

AR 375.

Neurological examination of Plaintiff revealed normal gait and heel/toe walk. *Id*. Plaintiff

could hop on both the left and right foot several times. *Id*. Motor examination revealed 100%

normal squat and 5/5 muscle grip, and knee extension strength in both the right and left extremities.

*Id*. Joint examination revealed normal wrists and hands. AR 376. Dr. Ingebretsen found that

Plaintiff had no evidence of carpal tunnel syndrome and no pain, swelling, or deformity of his right

knee. *Id*. Dr. Ingebretsen stated:

> He was friendly and cooperative and communicative. He remembers
> and follows commands. He was able to gesture with his hands and
> signed his name. He had normal vision and could read normal print.
> I followed him down the hallway to the cafeteria where he ordered
> lunch and carried it on the tr[a]y to his table and sat down and fed
> himself. He was able to make change and order his own food.

AR 376.

On June 29, 2009, Plaintiff presented to Dr. Warren L. Butterfield for evaluation of his right

knee injury. AR 400. Plaintiff reported that his knee felt unstable when he did things like climbing

stairs. *Id*. Examination of his right knee showed no swelling or ecchymosis. AR 401. There were

no points of tenderness and he had no varus or valgus instability. *Id*. He had full range of motion.

*Id*. Dr. Butterfield stated "I am not sure of Ron's exact diagnosis but I don't pick up on anything in

his physical exam that would need surgical intervention. Certainly he seems to have a stable

kneecap and a stable knee overall. His quadriceps are atrophied slightly on the medial side." *Id*.

He recommended that Plaintiff not "baby the knee anymore, as he has not had any documented

dislocation, that he attempt to ambulate with a normal gait, that he attempt stairs in a normal

fashion." *Id*. Plaintiff asked Dr. Butterfield to prescribe some pain medication for him because the

4th Street Clinic discontinued giving him narcotic medications in anticipation of his surgery. *Id*.
Dr. Butterfield refused to start Plaintiff on narcotic medication and recommended that Plaintiff
continue with the tramadol. *Id*.

### D.    Medical History (Psychological)

On September 20, 2007, plaintiff presented to the 4th Street Clinic for a psychiatric
evaluation with Clinical Social Worker (CSW) Ruth Miller-Turner. AR 360. Plaintiff reported
that he started to consume alcohol when he was 10 years old. AR 361. He reported that he started
using drugs when he was 12 years old and had used methamphetamine, cocaine, crack, heroin,
morphine, lortab, LSD, valium, PCP, mushrooms, and marijuana. *Id*. Plaintiff denied any physical
abuse growing up but reported one instance of sexual abuse from a cousin when he was 8 years old.
AR 362. Plaintiff denied any thoughts of danger to himself or to others. AR 363. He was
described as "clean kempt" and APRN Braun noted that Plaintiff was "not afraid to speak in front
of groups; but gets very emotional speaking in front of group." AR 360, 363. CSW Miller-Turner
diagnosed Plaintiff under DSM-IV Axis I with Moderate Depressive Disorder (296.32) and
Recurrent Alcohol Abuse (303.90), noting that Plaintiff was 58 days sober. AR 363. Plaintiff was
prescribed Prozac and instructed to follow-up with John Humphreys and with his scheduled social
worker appointment. AR 363.

On January 19, 2008, Plaintiff was scheduled to complete Phase I of the Salvation Army's
rehabilitation program. AR 338. Clinical Director, Gerald R. Riley, MA, LPC (Master of Arts,
Licensed Professional Counselor) noted that Plaintiff's current DSM-IV AXIS I diagnoses were
303.90 Severe Alcohol Dependence, primary, and 311 Depressive Disorder NOS, secondary. AR
338. He noted that Plaintiff was currently taking Fluoxetine and that his "[m]ood seems
stabilized." *Id*. He requested that Margo Halliday, a rehabilitation counselor with the Utah State
Office of Rehabilitation, assist Mr. Beatty to "get back on his feet vocationally." *Id*.

On May 27, 2009, Plaintiff presented to William Kuentzel, M.D. for a "Social Security
Examination" regarding his mental health status. AR 368-373. Plaintiff informed Dr. Kuentzel
that he was applying for social security due to his right knee and his mental health. *Id*. He also
reported needing surgery on his right wrist. *Id*. He reported having suicidal thoughts all the time,

but improved when he was on medication. *Id*. He associated his suicidal ideation with being "basically homeless off and on since 2000." AR 369. He reported that with medication his mood is better and more stable. *Id*. He stated "my dark thoughts which were really common are not so common now. I feel its been a lifesaver for me." AR 368. Plaintiff reported "instances" of both physical and sexual abuse by a cousin when he was 8 years old. AR 370. Dr. Kuentzel noted that the Plaintiff "drinks beer a couple of times a month. He will go through a 12-pack in a day." AR 369-70. Dr. Kuentzel described Plaintiff as "overweight, good hygiene, had showered, shaved and dressed for the appointment... He was anxious and depressed. His affect was blunted, almost flat, consistent with his depressed mood." AR 372. Plaintiff scored a 28 out of 29 on the mini mental status and had no problems with serial sevens. AR 379. Dr. Kuentzel diagnosed Plaintiff at Axis I with major depression, chronic, recurrent anxiety disorder with generalized features and history of panic attack. AR 372. He diagnosed Plaintiff at Axis IV with stressors including being unemployed, physical problems, no close friends, no social support network, no insurance, limited access to healthcare, and homelessness. *Id*. Under Axis V, the doctor also noted that Plaintiff's current GAF score was 45 with serious impairment in social functioning. AR 373.

State Agency Consultant Patricia Truhn, PhD completed a Psychiatric Review Technique of Plaintiff on June 10, 2009. AR 380. Dr. Truhn noted Plaintiff's medical disposition (mental impairments) as 12.04 affective disorders, 12.06 anxiety-related disorders, and 12.09 substance addiction. *Id*. Under category 12.04, she diagnosed Plaintiff with depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking. AR 383. Under category 12.06 she noted that Plaintiff's anxiety with panic attacks was a medically determinable impairment that was present but did not precisely satisfy the diagnostic criteria. AR 385. Under category 12.09 she noted that Plaintiff's history of drug and alcohol use was similarly a medically determinable impairment that was present but did not precisely satisfy the diagnostic criteria. AR 388. Dr. Truhn found that Plaintiff had mild restrictions of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. AR 390. She concluded that Plaintiff was capable of performing simple work with limited public

contact.  AR 392.  Another State Agency Consultant Psychologist, Laurie Sullivan, PhD, reviewed the case on September 23, 2009 and adopted the prior physical and mental residual functional capacity assessments.  AR 409.

Plaintiff was referred by his lawyer to Ralph W. Gant, PhD, psychologist, for a mental evaluation on or about August 8, 2010.  AR 414.  This referral was confirmed by counsel during the hearing before the ALJ.  AR 52-53.  Dr. Gant stated in his August 8, 2010 report that Plaintiff had previously been referred to his clinic by the Utah Division of Rehabilitation Services and Plaintiff received psychotherapy on September 2, 2009 and again on September 22, 2009.  AR 415. A "Confidential Progress Note" prepared by Dr. Gant on February 24, 2010 stated that Plaintiff came to his clinic on September 2, 2009 to initiate the first of six sessions of psychotherapy.  AR 425-426.  Dr. Gant obtained a mental health history from the Plaintiff which included his complaints of severe anxiety, depression and suicidal thoughts in July and August 2009.  Dr. Gant noted that Plaintiff had applied for Social Security disability and had been turned down.  Plaintiff reported that he did not want to leave his home; that "it is freaky for me to deal with anything;" that he does not leave his home except for doctors appointments and groceries; that he had serious problems with memory and described cognitive disorganization.  Plaintiff also referenced the numerous medications he has been prescribed for his psychologic symptoms.  AR 425.  On September 22, 2009, Plaintiff reported experiencing panic attacks, mostly when he is outside.  He also reported depression.  Plaintiff stated that he had suffered from both depression and panic attacks on a long-term basis.  AR 425-426.

On December 9, 2009, Dr. Gant completed a "Medical statement regarding organic brain syndrome and depression with anxiety, OCD, PTSD or panic disorder for Social Security disability claim."  AR 427-428.  In this document, Dr. Gant completed a checklist of symptoms or conditions that were present.  AR 427.  He also rated Plaintiff's mental impairments as follows:  General limitations caused by psychiatric conditions: "Marked."  Difficulty in maintaining social functioning: "Marked."  AR 428.  The statement also listed numerous specific mental functions relating to work in which Dr. Gant stated that Plaintiff was markedly limited.  Dr. Gant found that Plaintiff was only moderately limited in two areas– the ability to understand and remember very

short and simple instructions, and the ability to carry out very short and simple instructions.  *Id.*

Dr. Gant stated in his August 2010 evaluation report that he administered a comprehensive interview, the Weschler Adult Intelligence Scale ("WAIS-III"), the Minnesota Multiphasic Personality Inventory ("MMPI-2"), an adult diagnostic screening battery, and the Wide Range Achievement Test ("WRAT-4").  AR 414.  Dr. Gant summarized Plaintiff's previous history and treatment at the clinic in September 2009.  He noted that "[d]uring the course of treatment we discussed Mr. Beatty's seeming difficulties in coming to the clinic, or for that matter, traveling in the community.  It quickly became evident that he suffered from agoraphobic avoidance, as he reported.  He discussed episodes of panic which he was unable to manage and which were not ameliorated through individual psychotherapy."  Apparently referencing the September 2009 therapy sessions, Dr. Gant stated the Plaintiff had reported "experiencing suicidality within two or three months prior to the time he came to this clinic.  He also reported at least 2 occasions in the past when he attempted suicide."  Dr. Gant further stated: "His depression and anxiety have reportedly continued at a severe level since he became known at this clinic."  Dr. Gant further noted that Plaintiff discontinued psychotherapy at the clinic after two sessions because it was almost impossible for him to leave home because of his agoraphobia and panic attacks.  Plaintiff, however, returned to the clinic for assistance in applying for SSA benefits.  Dr. Gant stated that the tests he performed on Plaintiff occurred over a period of several months; that Plaintiff sometimes made appointments and then cancelled at the last minute because he was unable to leave his home.  AR 415.

According to Dr. Gant's August 8, 2010 report, Plaintiff reported that he suffered a personality change as a consequence of a motor vehicle accident that occurred in 1999.  AR 416. He believed that his capacity for thinking, problem solving, and mood management was dramatically reduced since that incident.  *Id.*  He further reported eight separate concussions caused by "slip and fall accidents."  *Id.*  Dr. Gant opined that Plaintiff suffers from a postconcussional disorder.  *Id.*  Under "Substance Abuse History," Dr. Gant noted that Plaintiff "reported his first use of alcohol at age 12.  It had been four months since his last drink when he came to the clinic.  He also reported the use of cocaine on five separate occasions in the 1980's.  He denied the use of any

substances at the time of this evaluation." AR 416. Dr. Gant described Plaintiff as cooperative and stated that "[he] was appropriately dressed in casual clothing with adequate attention to person and grooming. His motor behavior was normal and he was clear and oriented in all spheres when he came to the clinic. Mr. Beatty reported problems with recent memory. His speech was normal and he appeared roughly average in intellectual functioning. AR 417.

During testing, Plaintiff produced a verbal IQ score of 99 (47th percentile), a performance IQ score of 98 (45th percentile), with a full-scale IQ of 99 (47th percentile) on the WAIS-III. AR 417. Dr. Gant noted that these scores placed Plaintiff in the average range of intellectual functioning. Dr. Gant stated that half way through the testing, Plaintiff reported the onset of what he described as a severe panic attack and stated he had to leave. AR 418. Dr. Gant described Plaintiff as "very agitated at the time." *Id*. The testing resumed on another occasion and was completed without seeming difficulty. Plaintiff produced an elevated T scale score (T-110) on the MMPI-2, which Dr. Gant noted was extremely elevated, suggesting severe levels of stress at the time. AR 419. The doctor opined that the available literature on the matter suggested that this set of test results should be discarded as the scoring literature does not address scores at that extreme elevation. AR 419.

During the Adult Diagnostic Screening Battery (ADSB), Plaintiff described apprehensiveness with feelings of anxiety, worry and fear; difficulties with concentration; and feelings of irritability. AR 420. He reported periods of extreme sadness and loss of pleasure in his life. He also reported his view that people are out to harm him and that he must always be on guard or secretive with others. AR 420. During the WRAT-4 test, Plaintiff produced word reading and sentence comprehension subtest scores at a point greater than the 12th grade 9 month level. AR 421. From these scores Dr. Gant opined that Plaintiff could be expected to perform adequately in reading tasks found at the community college and possibly the university level. AR 421. Plaintiff's spelling score fell below the 6th grade, 9 month level. *Id*. His math score fell at the 8th grade, 7 month level. *Id*. Dr. Gant opined that the lower scores suggested mathematics disorder. *Id*. Dr. Gant stated:

. . .

> Job placement does not appear an appropriate intervention at this time. From all available medical information and also information derived from the psychological testing for this report suggested there will be a need for skill development before attempts at job placement will be effective. Mr. Beatty will likely require some assistance with job coaching once adequate employment has been found.

AR 422.

Dr. Gant concluded that in his opinion, "Mr. Beatty will be unable to work in any form of employment for a minimum period of one year." AR 423. He diagnosed Plaintiff at Axis I with Posttraumatic Stress Disorder Chronic, Panic Disorder with Agoraphobia Severe, Major Depressive Disorder Recurrent/Severe, Cognitive Disorder NOS, Mathematics Disorder, and Disorder of Written Expression. AR 423.

Plaintiff received mental health counseling and treatment from Samuel Vincent, an Advanced Practice Registered Nurse (APRN), from May 28, 2009 through March 20, 2011. AR 454-528. On November 12, 2010, APRN Vincent saw Plaintiff for a "Behavioral Health/Psych Med Check." AR 526. APRN Vincent noted that:

> about 6 weeks ago he noticed that he had been screaming at people, very agitated, did not feel like himself, was extremely irritable. He decided it was from the Risperidone and stopped taking it. He actually stopped taking all of his medications, has been off them for the last 5 weeks. He states that the last 5 weeks have been "like a black hole vortex of depression, suicidal thoughts, not leaving the house, not caring about anything." He goes days without showering, has low appetite, won't come out of his house. Will wash his pants in the sink so he doesn't have to leave his apartment to do laundry.

AR 526.

APRN Vincent also noted that Mr. Beatty appeared for the appointment with "good grooming and hygiene, dressed in clean clothes and baseball cap." *Id.*

In a letter dated January 11, 2010,[1] APRN Vincent advocated on behalf of Mr. Beatty's disability application. AR 507. He noted that the Plaintiff has been a patient of his for fourteen months and that "Ronald's panic disorder is one of the most severe I have treated." *Id.* He stated

---

[1] The 2010 year date on this letter appears to be in error since APRN Vincent stated that he treated Plaintiff for 14 months beginning in May 2009. The medical statement that APRN Vincent prepared and which rated Plaintiff's mental functional capacity is dated January 10, 2011. These two documents appear to have been prepared at or near the same time.

13

that in the first few months that he treated Plaintiff, he would have to leave the sessions early in the midst of panic attacks. "As time passed, he has become better able to sit through interviews with me, but it is clear that he remains in a state of very high anxiety." *Id.* APRN Vincent further stated that Plaintiff:

> fears the attacks, is persistently concerned about having additional panic attacks and concerned about possible health implications of the attacks. As a result he isolates himself and is dysfunctional in social and occupational settings. He has been taking multiple prescription medications over the last year, with only minimal improvement in his symptoms, and with several acute episodes of decompensation in that time.

AR 507.

APRN Vincent stated that in his opinion, Plaintiff "is not at this time able to engage in gainful employment, and I cannot say with any confidence that this is likely to change in the foreseeable future." AR 507.

On January 10, 2011, APRN Vincent also completed a "Medical statement regarding depression with anxiety, OCD, PTSD or panic disorder for Social Security disability claim."[2] APRN Vincent indicated on this form that Plaintiff generally had marked restrictions of activities of daily living and marked difficulty in maintaining social functioning. APRN Vincent reported that Plaintiff had moderate limitations in the ability to remember locations and work-like procedures; to interact appropriately with the general public; to ask simple questions and receive assistance; to get along with co-workers or peers without distracting them or exhibiting behavior extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals and make plans independently of others. APRN Vincent found insignificant limitations in Plaintiff's ability to understand and remember very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; and to be aware of normal hazards and take appropriate precautions. He otherwise found that Plaintiff was markedly limited in his ability to function in the workplace or in social interaction. AR 509.

_____

[2] This checklist form is the same as the one completed by Dr. Gant on December 9, 2009.

14

On March 29, 2011, APRN Vincent reported that he received an email from Plaintiff stating that he had been released from the hospital after attempting suicide and was not doing well.  AR 515.  APRN Vincent called Plaintiff to schedule an appointment, but Plaintiff did not want to schedule an appointment over the telephone.  *Id*.

Ronald P. Houston, PhD completed a Psychiatric Review Technique at the request of the Social Security Administration on April 1, 2011.  Dr. Houston assessed Plaintiff with Affective Disorder, Listing 12.04; Anxiety-Related Disorders/Panic Disorder, Listing 12.06; and Substance Addiction Disorder, Listing 12.09.  AR 530.  He noted that Plaintiff's impairments were not severe.  *Id*.  AR 540.  As part of the Psychiatric Review Technique, Dr. Houston also rated Plaintiff's functional limitations on a Social Security Administration form.  Dr. Houston stated that Plaintiff had only mild restrictions of activities of daily living; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence or pace; and that he had no episodes of decompensation, each of extended duration.  AR. 540.  Dr. Houston stated that he found it "very odd" that Dr. Gant did not include a substance abuse diagnosis in his psychological evaluation report of Plaintiff, given that the Plaintiff's history and medical records showed alcohol dependence to be his primary disorder.  AR 551.  Dr. Houston also opined that the only two medical exhibits showing marked impairments in areas defined under the "B" criteria were questionable because they did not address Plaintiff's long standing primary impairment of severe alcohol dependence.  AR 556.

### E.    Vocational Expert Testimony

Vocational Expert James Roman Cowart testified at the July 19, 2011 hearing before the ALJ.  AR 73-86.  Mr. Cowart testified that in the preceding 15 years Plaintiff had worked as a sports book writer and in retail.  AR 75.  In response to the ALJ's question, Plaintiff stated his retail job was in the gift shop at Zion National Park.  Based on Plaintiff's description of this job, Mr. Cowart classified it as a "Cashier II" position with Dictionary of Occupational Titles (DOT) Code 211.462-010.  AR 75-76.  Mr. Cowart stated it is light work and has an SVP (Specific Vocational Preparation) of 2.  AR 77.

. . .

The ALJ asked Mr. Cowart to assume a hypothetical individual, age 53, with a tenth grade education, and past relevant work as a sports bookmaker and Cashier II.  The ALJ further asked Mr. Cowart to assume that the individual has a combination of impairments, including affective disorder for depression, anxiety related disorder or post-traumatic stress disorder, "a history of alcohol," and a right-knee problem.  Based on these impairments the individual would have the following residual physical functional capacity: able to occasionally lift 20 pounds and to frequently lift 10 pounds; able to sit or stand for six hours in an eight hour day; able to occasionally walk, climb stairs, squat, kneel, use foot controls and drive a vehicle; able to frequently bend and stoop, reach above shoulders, push and pull, turn arms and wrists, open and close fists, and use hands and fingers; able to continuously balance one's self; and would be in the normal range with regards to his hands, manual dexterity, fine dexterity and grip strength for right and left hands.  AR 78.

The ALJ further asked Mr. Cowart to assume that the hypothetical individual would have the following residual mental functional capacity:  mild to moderate limitation in the ability to concentrate; mild limitation in memory; no limitation in the ability to understand; mild limitation in the ability to exercise judgment; mild limitation in the ability to remember work procedures; no limitation in the ability to follow simple instructions; mild limitation in the ability to follow detailed instructions; mild to moderate limitation in the ability to perform duties within a schedule; mild limitation in the ability to maintain a schedule without supervision; mild limitation in the ability to relate with others, interact with the public, get along with co-workers, and deal with work-production; and moderate limitation in the ability to deal with stress.  AR 79.

Based on these limitations, Mr. Cowart testified that the individual would not be able to perform heavy or medium work, but would be able to perform light and sedentary work.  Mr. Cowart stated that such an individual could not work as a sports bookmaker, but could work as a Cashier II.  AR 80.  The ALJ asked Mr. Cowart if there were other jobs available in the national economy that the individual could perform.  Mr. Cowart testified that the individual could work as a "produce weigher," DOT Code 299.587-010, which is light work with an SVP of 1.  He testified that there are approximately 75,000 such jobs in the national economy.  AR 80-81.  On cross-

1    examination, Plaintiff's counsel asked Mr. Cowart to assume that the hypothetical individual would

2    be "significantly limited" in several of the mental functions referenced by the ALJ in his

3    hypothetical.   AR 82-83.   Mr. Cowart testified that an individual with those levels of limitations

4    would not be able to work in our economy.   AR 83.

5              **F.    ALJ's Decision**

6              In his decision dated July 28, 2011, ALJ Martinez found that Plaintiff was not disabled

7    within the meaning of the Social Security Act from January 7, 2008, through the date of his

8    decision, because the Plaintiff possessed sufficient residual functional capacity ("RFC") to perform

9    work that exists in significant numbers in the national economy.   AR 35.   In reaching this

10   conclusion, the ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f).   First,

11   the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset

12   date of January 7, 2008.   AR 24.

13             Second, he found that the Plaintiff has severe impairments including "depression,

14   Posttraumatic Stress Syndrome (PTSD), drug addiction and alcohol, and right knee."   AR 25.   The

15   ALJ noted that "Depression" included Dr. Kuentzel's diagnosis that Plaintiff had "Major

16   depressive disorder, recurrent, chronic, Anxiety disorder with generalized features and history of

17   panic attack."   AR 25.   He also noted that "PTSD" included Dr. Gant's diagnosis that Plaintiff had

18   "PTSD chronic, Panic disorder with Agoraphobia severe, Major depressive disorder

19   recurrent/severe."   *Id*.

20             At step three, the ALJ found that Plaintiff did not have an impairment or combination of

21   impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404,

22   Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), § 404.1525, § 404.1526, § 416.920(d), §

23   416.925, and §416.926).   AR 25.   In making this determination, the ALJ evaluated Plaintiff's knee

24   pain with regard to listing 1.02, major dysfunction of joints due to any cause, and found that his

25   medical records did not show that he medically met or equaled the listing.   AR 25.   The ALJ

26   similarly evaluated Plaintiff's mental impairments, singularly and in combination, with the criteria

27   of listings 12.04 affective disorder depression, 12.06 anxiety related disorder, panic disorder, and

28   12.09 alcohol dependence primary.   AR 25, 48.   He found that Plaintiff's mental impairments did

not meet the "paragraph B" criteria because they did not result in at least two marked restriction of

activities of daily living; marked difficulties in maintaining social functioning; marked difficulties

in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of

extended duration.  AR 25-26.  The ALJ further stated:

> In activities of daily living, the claimant has mild restriction.  The claimant has reported that he is able to clean, dust, wash dishes and do laundry.  He appears clean with good hygiene at medical visits.  In social functioning, the claimant has moderate difficulties.  He uses public transportation and can go out alone.  He prefers to shop, get his mail, or take out trash in the evening.  With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant reported that he spent most of the day watching TV.  The claimant spends time reading.  He testified that he is able to drive his car.  As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

AR 26.

The ALJ also found that Plaintiff failed to establish the presence of the "paragraph C"

criteria.  *Id*.  He stated, "the evidence fails to show the claimant's anxiety results in a complete

inability to function independently outside the area of one's home as per 12.06c." *Id*.

Prior to step four of the sequential analysis, the ALJ found that Plaintiff had the residual

functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b) and 416.967(b)

with the following limitations: lift 20 pounds occasionally and 10 pounds frequently; sit and stand 6

hours in an 8-hour workday; walk and climb stairs occasionally, squat occasionally, bend and stoop

frequently, kneel occasionally, balance continuously, and reach above the shoulders frequently; turn

arms and wrists frequently, open and close fists frequently, use hands and fingers frequently, use

foot controls occasionally; drive a vehicle occasionally; grip strength, fine dexterity, and manual

dexterity, are normal range for both the right and left hands; vision in left eye and right eye is

normal; and hearing right ear and left ear is normal, no hearing aids.  AR 27.

In regard to Plaintiff's residual mental residual functional capacity, the ALJ found that he

had mild to moderate limitation in his ability to concentrate; mild limitations in his ability to use

memory; no limitations in his ability to understand; mild limitations in his ability to exercise

judgment; mild limitations in his ability to remember work procedures; no limitations in his ability

to follow simple instructions; mild limitations in his ability to follow detailed instructions; mild to moderate limitations in his ability to perform duties within a schedule; mild limitations in his ability to sustain a routine without supervision; mild limitations in his ability to relate with others; mild limitations in his ability to interact with the general public; mild limitations in his ability to interact with co-workers; mild limitations in his ability to deal with work production; moderate limitations in his ability to deal with stress; his understanding and memory were not significantly limited; his concentration and persistence were not significantly limited; his social interaction was not significantly limited; and his adaptation was not significantly limited. AR 27. In making this determination, the ALJ stated that the "residual functional capacity assessment is supported by the medical evidence, the evaluations of the State medical agencies, and the partially credible statements of the claimant, Mr. Riley, and Mr. Vincent." AR 33.

Based on his determination of Plaintiff's residual functional capacity, ALJ Martinez found at step five that Plaintiff could perform the requirements of a representative occupation such as "produce weigher". AR 34. In so finding the ALJ relied on the opinion of the vocational expert, Mr. Cowart, to determine the extent to which Plaintiff's limitations eroded the unskilled light occupational base and to determine whether jobs exist in the national economy for an individual of Plaintiff's age, education, work experience, and residual functional capacity. AR 34. The ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and that Plaintiff is therefore "not disabled" under the framework of the Social Security Act. AR 35.

## DISCUSSION

### I.     Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal.

2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). The court "may not affirm simply by isolating a 'specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012), quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)    he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b). Second, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id*. § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id*. § 416.920(e). If the claimant can engage in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by

21

1  demonstrating that the claimant is able to perform other kinds of work.  *Id.* § 404.1520(f).  If the

2  Secretary cannot meet his or her burden, the claimant is entitled to disability benefits.  *Id.* §

3  404.1520(a).

4        **III.**    **Analysis of the Plaintiff's Alleged Disability**

5        **A.**    **The ALJ's Credibility Determination.**

6        Although Plaintiff originally claimed that he was disabled because of his physical

7  impairments (right knee and carpal tunnel syndrome) and his mental impairments, by the time of

8  the first hearing before the ALJ on January 12, 2011, Plaintiff and his counsel acknowledged that

9  his physical impairments were no longer disabling.  AR 96.  Plaintiff continued to allege that he

10  was disabled due to his severe mental impairments.  The ALJ found that Plaintiff's testimony and

11  statements regarding the severity of his depression, anxiety and panic attacks were not completely

12  credible.  The ALJ stated that "[a]lthough the inconsistent information the claimant provided may

13  not be the result of a conscious intention to mislead, the inconsistencies nevertheless suggest that

14  the information the claimant provided may not be entirely reliable."  AR 31.

15        In assessing the credibility of a claimant's testimony, the ALJ engages in a two-step

16  analysis.  First, the ALJ must determine whether there is objective medical evidence of an

17  underlying impairment which could reasonably be expected to produce the alleged symptoms.  If

18  such evidence is presented and there is no evidence of malingering, then the ALJ must give

19  specific, clear and convincing reasons for rejecting the claimant's testimony about the severity of

20  his symptoms.  *Molina v. Astrue*, 674 F.3d 1104, 1112-3 (9th Cir. 2011), citing *Vasquez v. Astrue,*

21  572 F. 3d 586, 591 (9th Cir. 2009) and *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

22  In evaluating credibility, the ALJ may use ordinary techniques of credibility evaluation:

23            For instance, the ALJ may consider inconsistencies either in the
               claimant's testimony or between the testimony and the claimant's

24            conduct, *id.*; "'unexplained or inadequately explained failure to seek
               treatment or to follow a prescribed course of treatment,'"

25            *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen,* 80 F.3d at 1284); and
               "whether the claimant engages in daily activities inconsistent with the

26            alleged symptoms," *Lingenfelter,* 504 F.3d at 1040.  While a claimant
               need not "'vegetate in a dark room'" in order to be eligible for

27            benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987)
               (quoting *Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981)), the

28            ALJ may discredit a claimant's testimony when the claimant reports

1
2
3
4

> participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999); *Fair,* 885 F.2d at 603. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner,* 613 F.3d at 1225; *Valentine,* 574 F.3d at 693.

5

*Molina*, 674 F.3d at 1112-13.

6       The Ninth Circuit has also stated that "ALJs must be especially cautious in concluding that

7   daily activities are inconsistent with testimony about pain, because impairments that would

8   unquestionably preclude work and all the pressures of a workplace environment will often be

9   consistent with doing more that merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995,

10   1016 (9th Cir. 2014).  The court also emphasized that in "discussing mental health issues, it is error

11   to reject a claimant's testimony merely because symptoms wax and wane in the course of

12   treatment." *Id.* at 1017.  The court noted that cycles of improvement and debilitating symptoms are

13   a common occurrence, and it is therefore error for the ALJ to pick out a few isolated instances of

14   improvement over a period of months or years and treat them as a basis for concluding that the

15   claimant is able to work. *Id.*

16       In this case, the objective medical evidence established that Plaintiff suffers from

17   depression, anxiety and panic disorder.  The ALJ found that Plaintiff's medical determinable

18   impairments could reasonably be expected to cause his alleged symptoms.  AR 28.  The medical

19   records contain no finding that Plaintiff was malingering.  The ALJ listed the following examples

20   of the inconsistent statements or conduct which raised doubt as to the credibility of Plaintiff's

21   statements regarding the severity of his symptoms:  Plaintiff told Dr. Kuentzel on May 27, 2009

22   that he was applying for disability because of his right knee, but testified at the January 2011

23   hearing that his knee was not the main problem, and that anxiety and depression were.  AR 31.

24   Plaintiff also reported to Dr. Kuentzel that he had panic attacks, but that Prozac had been helpful

25   and he had not had panic attacks since being placed on Prozac.  Plaintiff testified that he had 20

26   panic attacks over the past two years, but when his counsel asked if that meant he had

27   approximately one panic attack a month, Plaintiff stated that he had more than one attack per

28   month.  AR 31.  The ALJ stated that while "claimant's use of alcohol is not material to this case, ...

1   it does show the claimant's inconsistency in his reporting to treatment providers." AR 31. The

2   ALJ cited Plaintiff's apparent inconsistent statements during various medical appointments

3   regarding his consumption of alcohol since June 2007– which Plaintiff identified as his "sobriety

4   date." The ALJ stated that "[t]hese different reports show an inconsistency in how much the

5   claimant actually drinks and to what extent it may be affecting him." AR 31.

6        The ALJ also found that Plaintiff provided inconsistent information to Dr. Gant and others

7   regarding the sexual abuse he experienced as a child. Plaintiff also provided contradictory

8   information regarding his alleged fear of needles; telling an APRN that he was unable to submit to

9   a blood test because of his fear of needles, whereas other information indicated that he sold plasma.

10  The ALJ also found that Plaintiff's alleged agoraphobia, fear of public places due to anxiety, was

11  inconsistent with statements in the records that he was waiting to start school, and Dr.

12  Ingebretson's observation of Plaintiff purchasing and eating lunch in a public cafeteria on the date

13  that Dr. Ingebretson examined him. The ALJ found this behavior to be "at odds with someone who

14  does not want to leave their home or be around people. The claimant appears to be able to

15  accomplish those things outside of his home that he wants to do." AR 31. Finally, the ALJ noted

16  that Plaintiff's clean and neat appearance at his various medical appointments contrasted with his

17  statements that he didn't take care of his hygiene or personal appearance. AR 31-32.

18        The instances cited by the ALJ provide some basis for questioning the credibility of

19  Plaintiff's statements regarding the severity of his symptoms. The ALJ reasonably noted that

20  Plaintiff's neat and well groomed appearance at his medical appointments was at odds with his

21  statements that he does not maintain his personal hygiene or take care of his clothing. Plaintiff's

22  refusal to give blood for a blood test because of his fear of needles is certainly inconsistent with the

23  information that he donates plasma. An arguable explanation for this inconsistency is that

24  Plaintiff's need for money overcame his fear of needles. Instances in which Plaintiff appeared to

25  function normally in public places without apparent difficulty are certainly inconsistent with his

26  alleged agoraphobia. The incident cited by the ALJ, however, involved Plaintiff's appearance for a

27  required medical examination relating to his application for disability benefits. The records of Dr.

28  Gant, APRN Vincent and other providers document instances in which Plaintiff left medical

24

appointments, declined to make appointments and declined to participate in therapy because of his anxiety.  There is no evidence that Plaintiff engaged in social or leisure activities inconsistent with his reported fear of being in public or social situations.  Nor is there any evidence that Plaintiff actually attended school or engaged in educational or training programs.

Plaintiff's initial estimate that he had suffered 20 panic attacks in the preceding two years is not inconsistent with his follow-up response that he now had more than one attack per month. Plaintiff was simply providing an estimate of the number of panic attacks in response to the questions posed to him during the hearing.  Nor is the Court persuaded that there was inconsistency in Plaintiff's statements to Dr. Kuentzel about his disability claim.  Plaintiff told Dr. Kuentzel in May 2009 that he was pursuing a disability claim in regard to his right knee, right wrist and mental condition.  At the time of Dr. Kuentzel's examination, Plaintiff was, in fact, still pursuing a disability claim based on his alleged physical impairments.   By the time of the January 2011 hearing, however, Plaintiff's knee and wrist condition had improved and no longer supported a claim for disability based on alleged physical impairments. (Plaintiff's credibility can arguably be questioned to the extent he did not earlier abandon his claim for physical disability.)

The ALJ's citation of one positive medical report to Dr. Kuentzel that Prozac had been helpful in controlling Plaintiff's panic attacks is the type of erroneous credibility finding criticized in *Garrison v. Colvin, supra.*  A review of the medical records, as a whole, does not show that Prozac was ultimately successful in relieving or controlling Plaintiff's anxiety and panic attacks. Plaintiff reported on October 20, 2009 that he had been taking Prozac for the past year, that it made him slow and inattentive, that he was experiencing panic attacks, had "difficulty leaving safe areas," and that his anxiety continued to get worse daily.  AR 475.  A November 24, 2009 progress note stated that Plaintiff became intensely anxious during the interview and asked to be excused. Plaintiff also inquired about taking some leftover Prozac.  AR 474.  In December 2009, Plaintiff reported to APRN Vincent that he experienced some improvement in his symptoms from taking Prozac.  AR 473.  In February 2010, APRN Vincent noted that Plaintiff's response to Prozac was good for depression and anxiety, but that Plaintiff felt numb and cognitively dulled and therefore had some ambivalence about Prozac.  AR 472.  In March 2010, the Plaintiff reported that he had

not been doing well lately and that he had so much depression and anxiety that he had not been interested in or capable of leaving his apartment– and had only left his apartment twice in the last month.  AR 468.  The reports of APRN Vincent indicate an overall progressive worsening of Plaintiff anxiety and depression.

Plaintiff identified July 2007 as his sobriety date.  Although he consumed alcoholic beverages after that date, it appears that his alcohol consumption significantly diminished.  Both Dr. Kuentzel and Dr. Gant noted Plaintiff's history of alcohol abuse in their respective 2009 and 2010 reports.  AR 369-370, 416.  Neither psychologist, however, diagnosed Plaintiff with alcohol dependence.  It appears, from the record as a whole, that Plaintiff was candid with both treating and examining physicians and psychologists about his history of alcohol abuse and use of controlled substances.

The record demonstrates some inconsistencies in Plaintiff's statements or conduct, as is likely to be the case with an individual who suffers from depression, anxiety and the effects of medications.  Based on a consideration of the record as a whole, however, those inconsistencies do not provide convincing reasons for the ALJ to have rejected the credibility of Plaintiff's testimony regarding severity of his depression, anxiety and panic attacks.

**B.     The ALJ's Determination of the Weight to Be Given to the Medical Opinions.**

The standards governing the weight to be given to the opinions of treating, examining and reviewing physicians was recently summarized in *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014) as follows:

> Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician.  *Holohan v. Massanari*, 246 F. 3d 1195, 1202 ( 9th Cir. 2001); 20 C.F.R. § 404.1527(c).  "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight."  *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir.2007) (internal quotations omitted) (alterations in original); *see also* 20 C.F.R. § 404.1527(c)(2)).  To reject an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence."  *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

26

> Even if a treating physician's opinion is contradicted, the ALJ may not simply disregard it. The ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion. *Orn,* 495 F.3d at 631; 20 C.F.R. § 404.1527(c)(2). These factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, the "[n]ature and extent of the treatment relationship" between the patient and the treating physician, the "[s]upportability" of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(2)-(6). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Orn,* 495 F.3d at 631. Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability. *Holohan,* 246 F. 3d at 1202– 03. An ALJ may only reject a treating physician's contradicted opinions by providing "specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198 (9th Cir. 2008); *accord Holohan,* 246 F. 3d at 1202– 03.

*Ghanim* further states:

> Only physicians and certain other qualified specialists are considered "[a]cceptable medical sources." *Molina,* 674 F.3d at 1111 (alteration in original); *see also* 20 C.F.R. § 404.1513(a). Nurse practitioners and therapists are considered "other sources." 20 C.F.R. § 404.1513(d). While their opinions must still be evaluated, 20 C.F.R. § 404.1527(c), the ALJ may "discount testimony from these 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" *Molina,* 674 F.3d at 1111 (quoting *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1224 (9th Cir. 2010)).

763 F.3d at 1161.

In concluding that Plaintiff has the residual mental functional capacity to perform light work, the ALJ gave "considerable weight" to the opinions of the State Agency consultants, Patricia Truhn, PhD and Laurie Sullivan, PhD, who provided residual functional capacity evaluations at the initial and reconsideration levels.[3] The ALJ noted that "[a]lthough those . . . psychologists were non-examining and therefore, their opinions are not controlling and do not as a general matter deserve as much weight as those of examining or treating physicians, in this case these opinions do deserve considerable weight, as there are no opinions from any primary care physicians." AR 33.

---

[3] The ALJ also gave considerable weight to the opinions of the State Agency consultants regarding Plaintiff's residual physical functional capacity. Because Plaintiff's physical capacity to perform work is not at issue, the opinions of those physicians are not discussed in these Findings and Recommendation.

1   The ALJ gave "some weight" to the opinion of Ronald P. Houston, PhD, another consulting

2   psychologist, because his opinion regarding the Plaintiff's residual mental functional capacity was

3   consistent with the opinions expressed by the State agency consultants.  AR 33.  The ALJ also gave

4   "some weight" to the opinion of Dr. William Kuentzel, M.D. who performed a mental consultive

5   examination of Plaintiff on May 27, 2009.  The ALJ stated that Dr. Kuentzel "opined that claimant

6   would be capable of simple work with limited public contact."  He also noted that "[c]ertain

7   aspects of the doctor's opinion are in fact consistent with the residual functional capacity

8   determined in this decision.  However, there are more current opinions as to claimant's abilities and

9   limitations . . . ."  AR 32.

10          The ALJ gave only slight weight to the opinion of psychologist Ralph Gant.  In regard to

11   Dr. Gant's opinions, the ALJ stated as follows:

12              Doctor Gant saw the claimant for a psychological evaluation report
                August 8, 2010 which is discussed elsewhere in this decision.  Doctor
13              Gant opined the claimant would require vocational training before
                finding adequate employment, and opined him unable to work "in
14              any form of employment for a minimum period of one year.  Doctor
                Gant did not see the claimant on a regular basis.  Doctor Gant does
15              not give objective reasons as to why the claimant would be unable to
                do any form of employment for one year.  The doctor apparently
16              relied quite heavily on the subjective report of symptoms and
                limitations provided by the claimant, and seemed to uncritically
17              accept as true most, if not all, of what the claimant reported.  Doctor
                Gant also does not appear to take into account the claimant's MMPI-
18              2 scores extreme nature.

19          AR 32.

20          The ALJ noted that APRN Vincent's January 11, 2011 letter stated that Plaintiff is not able

21   to engage in gainful employment now or in the future.  The ALJ stated, however, that pursuant to

22   Social Security Ruling 96-5p, the issue of disability is reserved to the Commissioner.  He stated

23   that although an APRN is not considered an "acceptable medical source," APRN Vincent

24   completed a medical source statement on January 10, 2011 noting restrictions consistent with

25   marked psychiatric conditions.  The ALJ stated that this "opinion is entitled to some consideration

26   (20 CFR 404.1513(d) and SSR 06-3p), however the undersigned did not find it was supported by

27   objective evidence, therefore this opinion is given slight weight."  The ALJ also gave only slight

28   weight to the opinion of Gerald Riley, MA, LPC of the Salvation Army, who stated that Plaintiff

1  held positions of high trust while employed at the Salvation Army due to his integrity and

2  trustworthiness.  AR 33.

3        The parties expend much effort in their briefs arguing whether Dr. Gant should be viewed

4  as a treating or examining psychologist.  Dr. Gant meets the general definition of a treating

5  psychologist because he provided psychotherapy to Plaintiff on two occasions–September 2 and 22,

6  2009.  His status as a "treating physician," however, does not automatically entitle his opinions to

7  greater weight than other physicians who examined Plaintiff or who reviewed the medical records

8  and provided opinions about Plaintiff's mental condition or residual mental functional capacity.  In

9  determining what weight to give to a treating physician's opinion, the Commissioner considers,

10  among other factors, the length of the treatment relationship and frequency of examination.  *See* 20

11  CFR § 404.1527(c)(i).  The Commissioner also considers the nature and extent of the treatment

12  relationship ("Generally, the more knowledge a treating source has about your impairment(s) the

13  more weight we will give to the source's medical opinion.")  § 404.1527(c)(ii).  It appears that Dr.

14  Gant saw Plaintiff at least two times for treatment in September 2009 and again in August 2010.

15  Dr. Gant stated in his August 8, 2010 report that after Plaintiff discontinued psychotherapy, "he

16  returned to the clinic to ask for assistance in applying for SSA benefits" and that "[t]he testing that

17  followed occurred over a period of several months."  Dr. Gant did not have an extensive or frequent

18  treatment relationship with the Plaintiff and, to that extent, less weight may be accorded to his

19  opinion than would be the case if he had regularly examined and treated Plaintiff over a period of a

20  year or two.  Dr. Gant is, however, the only psychologist who had any treatment relationship with

21  the Plaintiff or who performed any extensive psychological testing on the Plaintiff.

22        The ALJ states that Dr. Gant did not give objective reasons as to why the claimant would be

23  unable to do any form of employment.  Dr. Gant, however, interviewed and examined the Plaintiff

24  and conducted various psychological tests.  He prepared fairly detailed reports of his findings and

25  conclusions.  The fact that Dr. Gant based his opinions on a consideration and evaluation of

26  Plaintiff's statements regarding his feelings of depression, anxiety and panic attacks is not

27  surprising given the nature of mental illness.  Dr. Gant stated that Plaintiff's F scale scores on the

28  MMPI-2 were at an elevated level and should discarded.  AR 419.  Although Dr. Gant did not

expressly discuss how the discarded MMPI-2 scores affected his evaluation of Plaintiff's mental condition, he was obviously aware of the invalid nature of the scores.  The ALJ also ignored or overlooked the mental residual functional capacity checklist that Dr. Gant completed on December 1, 2009.  According to that checklist, Dr. Gant found that Plaintiff was markedly limited in many tasks that would be required to perform work.  AR 428.  The mental impairment checklist form completed by Dr. Gant is similar to the residual functional capacity assessment form completed by the State Agency consultants, Doctors Truhn and Sullivan, and by consulting psychologist Dr. Houston.  Although those psychologists found that Plaintiff was only mildly or moderately limited with respect to certain functions, unlike Dr. Gant, they did not interview, examine or test the Plaintiff.  APRN Vincent also completed a mental impairment checklist form, the findings of which were substantially similar to Dr. Gant's findings.

Plaintiff primarily received ongoing examinations, treatments and prescriptions from nurses and physician's assistants such as APRN Vincent.  APRN Vincent's reports and notes provide the most detailed picture of the progression of Plaintiff's depression, anxiety and panic disorder between May 2009 and March 2011.  Because APRN Vincent is not an "acceptable medical source," his opinions regarding Plaintiff's mental impairments and the severity of those impairments, standing alone, would be insufficient to support a finding of disability.   His examination and treatment findings, however, are consistent with the diagnoses made by Dr. Kuentzel in May 2009 and by Dr. Gant in September and December 2009 and in August 2010.  The reports and opinions of Dr. Gant and APRN Vincent, taken together, provide substantial evidence in support of a finding that Plaintiff has marked impairments that preclude him from working.

Dr. Kuentzel did not prepare a residual mental functional assessment or offer an express opinion about Plaintiff's ability to work.  AR 368-373.  He did state that Plaintiff's Global Assessment Functioning ("GAF") score was 45.  AR 373.  This generally indicates serious symptoms or impairment in social, occupational, or school functioning.[4]  The ALJ stated that "Dr.

---

[4] "GAF scores 'are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.'"  *Sweeney v. Commissioner of Social Sec.*, 847 F.Supp.2d 797, 802 (W.D.Pa. 2012), citing *Irizarry v. Barnhart,* 233 Fed.Appx. 189, 190 n. 1 (3d Cir. 2007).  "'The GAF scale,

1   Kuentzel opined the claimant would be capable of simple work with limited public contact." AR

2   32. Dr. Kuentzel's report contains no such statement. Dr. Truhn, the State Agency consultant,

3   made this statement. AR 379. The ALJ's erroneous attribution of this opinion to Dr. Kuentzel,

4   standing alone, might be harmless. Because Dr. Kuentzel is the only psychologist besides Dr. Gant

5   to have actually examined the Plaintiff, however, the ALJ's error is more significant. The only

6   psychologists who opine that Plaintiff has the residual mental functional capacity to work are the

7   non-examining psychologists.

8       The opinions of Dr. Gant, together with the opinions of APRN Vincent, support a finding

9   that Plaintiff suffered from severe mental impairments which markedly limited his ability to

10  perform a number of work related tasks. Dr. Kuentzel's opinions regarding Plaintiff's mental

11  impairments are consistent with the findings of Dr. Gant. As stated above, the ALJ has not

12  provided convincing reasons to reject the credibility of Plaintiff's testimony and statements

13  regarding the severity of his symptoms of depression, anxiety and panic attacks. The ALJ has also

14  failed to provide legitimate reasons supported by substance evidence for according greater weight

15  to the opinions of the non-examining consulting psychologists than to the opinions of Plaintiff's

16

17  designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest

18  and 100 being the highest.'" *Id.*, citing *West v. Astrue,* 2010 WL 1659712, at *4 (E.D.Pa. Apr. 26, 2010).
"An individual with a GAF score of 60 may have '[m]oderate symptoms' or 'moderate difficulty in social,

19  occupational, or school functioning;' of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)' or
'impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);' of 40

20  may have '[s]ome impairment in reality testing or communication' or 'major impairment in several areas,
such as work or school, family relations, judgment, thinking or mood'. . . ." *Gallagher v. Astrue*, 2012 WL

21  2344455, at *10 n. 3 (W.D.Pa. 2012), citing *American Psychiatric Association: Diagnostic and Statistical

22  Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed.2000); *Bracciodieta–Nelson,* 782 F.Supp.2d 152,
157 (W.D.Pa.2011)."

23

24       Despite its usefulness as a tool for psychological assessment, courts in the Ninth Circuit hold that a
GAF score is not determinative of mental disability or limitation for social security purposes, and an ALJ is

25  not bound to consider it in determining whether a claimant is disabled by a mental impairment. *Hammons
v. Colvin*, 2013 WL 5786092, at *10 (W.D.Wash. 2013), citing *McFarland v. Astrue,* 288 Fed. Appx. 357,

26  359 (9th Cir. 2008) and *Orellana v. Astrue,* 2008 WL 398834, at *9 (E.D.Cal. Feb.12, 2008). *See also
Mann v. Astrue*, 2009 WL 2246350, at *1 (C.D.Cal. 2009) and *Thomas v. Astrue*, 2009 WL 141488, at *6

27  (C.D.Cal. 2009). In this case, the ALJ noted that Plaintiff's GAF scores ranged from 36-75, and he
therefore gave them little weight. AR 50.

28

treating/examining psychologist Dr. Gant, whose opinions are also supported by or consistent with the findings and opinions of APRN Vincent, and the opinion of Dr. Kuentzel.  If the ALJ had given greater weight and credit to the opinions of Dr. Gant, APRN Vincent and Dr. Kuentzel, as well as to Plaintiff's testimony and statements regarding the severity of his symptoms, then he may have concluded that Plaintiff's mental impairments met or medically equals one of the listed impairments at step three of the sequential evaluation process.  Alternatively, the ALJ would have been required to find that Plaintiff did not have the residual mental functional capacity to perform his past work or to perform other light or sedentary work at step five of the sequential process and that he was entitled to an award of disability benefits.

**IV.    Whether this Case Should be Remanded for the Payment of Benefits or For Further Hearing and Determination.**

"Usually, [i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014), quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (internal quotation marks and citation omitted).  *Garrison* notes, however, that "every Court of Appeals has recognized that in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits." *Id.* (citations omitted). "Courts have generally exercised this power when it is clear from the record that a claimant is entitled to benefits, observing on occasion that inequitable conduct on the part of the Commissioner can strengthen, though not control, the case for such remand." *Id.*  The court noted that in *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) ("*Varney II*"):

> We held that "where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony was credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony. Rather, we will ... take that testimony to be established as true." *Id.* at 1401.  We explained that this credit-as-true rule is designed to achieve fairness and efficiency.

*Garrison*, 759 F.3d at 1019.

The Ninth Circuit has established a three-part credit-as-true standard which must be satisfied in order to remand a case to an ALJ with instructions to calculate and award benefits: (1)

the record has been fully developed and further administrative proceedings would serve no useful

purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether

claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited

as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, at 1020,

citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter v.

Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007);

*Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292

(9th Cir. 1996).

     *Garrison* states that it has been held to be an abuse of discretion not to remand with

direction to make payment when all three conditions are met. *Id.* at 1020. The court noted,

however, that in *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003), it cautioned that the credit-as-

true rule may not be dispositive on remand in all cases and that the rule envisions some flexibility.

The court states:

> *Connett*'s "flexibility" is properly understood as requiring courts to
> remand for further proceedings when, even though all conditions of
> the credit-as-true rule are satisfied, an evaluation of the record as a
> whole creates serious doubt that the claimant is, in fact, disabled.
> That interpretation best aligns the credit-as-true rule, which preserves
> efficiency and fairness in a process that can sometimes take years
> before benefits are awarded to needy claimants, with the basic
> requirement that a claimant be disabled in order to receive benefits.
> Thus, when we conclude that a claimant is otherwise entitled to an
> immediate award of benefits under the credit-as-true analysis,
> *Connett* allows flexibility to remand for further proceedings when the
> record as a whole creates serious doubt as to whether the claimant is,
> in fact, disabled within the meaning of the Social Security Act.

*Garrison*, 759 F.3d at 1021.

     The Court finds in this case that all three elements of the credit-as-true rule have been met.

The record was fully developed insofar as all of Plaintiff's relevant treatment records were obtained

and made part of the record, and the Commissioner and ALJ had the opportunity to and did obtain

opinions from examining or consulting psychologists to evaluate Plaintiff's mental impairments

and his residual mental functional capacity. Second, the ALJ failed to provide legally sufficient

reasons for rejecting the Plaintiff's testimony and statements regarding the severity of his

symptoms, and for rejecting or giving only some or slight weight to the opinions of Plaintiff's

treating or examining psychologists, and treating APRN.  Finally, if Plaintiff's testimony and statements regarding the severity of his symptoms and the opinions of his treating and examining psychologist, Dr. Gant, were credited as true, the ALJ would be required on remand to find at steps four and five of the sequential process that Plaintiff was disabled and entitled to an award of benefits.

## CONCLUSION

The ALJ's determination that Plaintiff was not disabled is not supported by substantial evidence in the record, but is instead based an erroneous rejection of the credibility of Plaintiff's statements and testimony regarding the severity of his symptoms, and on the ALJ's erroneous decision to accord greater weight to the opinions of non-examining State agency psychologists, than to the opinions of Plaintiff's treating or examining psychologists and APRN.   Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (#21) be **granted** and that the Acting Commissioner's Cross Motion to Affirm (#25) be **denied.**

**IT IS FURTHER RECOMMENDED** that this case be remanded to the Social Security Administration with instructions to calculate and award benefits to the Plaintiff.  In the alternative, the undersigned recommends that this case be remanded for further hearing to determine whether Plaintiff is disabled at step three or five of the sequential evaluation procedure.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual

. . .

. . .

. . .

. . .

34

issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 20th day of February, 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

35